UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

WILLIAM F. NORED and )
LAWANDA JEAN NORED, )
) 3:19-CV-00214-DCLC
Plaintiffs, )
)
vs. )
)
TENNESSEE DEPARTMENT OF )
INTELLECTUAL AND )
DEVELOPMENTAL DISABILITIES and )
BRAD TURNER, )

Defendants.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court following a bench trial on November 3 and 4, 2020. The

parties filed post-trial briefs [Docs. 138, 141, 142]. Plaintiffs, William and LaWanda Jean Nored

(together, "the Noreds"), as conservators, parents, and next friends of their son, William Nored,

Jr. ("the Nored's son"), sued Defendants, Tennessee Department of Intellectual & Developmental

Disabilities ("DIDD") and Commissioner Brad Turner, for failure to provide adequate medical

care and services to their son, who is disabled. In accordance with Federal Rule of Civil Procedure

52(a)(1), the Court makes the following findings of fact and conclusions of law.

I. **Findings of Fact**

DIDD is a Tennessee state agency that administers services and support to qualified

individuals with intellectual and developmental disabilities. As part of its responsibilities, DIDD

administers the Medicaid Home and Community-Based Services Waiver Program ("HCBS

Waiver Program") through its contract with TennCare. The funding for the HCBS Waiver Program

is 2/3 federal funds with the balance being paid by the State of Tennessee. This program pays for

1

services in the home setting for qualified disabled individuals. DIDD does not provide direct services in the HCBS Waiver Program, but manages a provider network, develops policies and procedures, provides quality assurance, ensures compliance with state and federal guidelines, reviews Individual Support Plans, preauthorizes services, and processes billing. DIDD authorizes and contracts with qualified third-party providers to provide the services to those qualified individuals to receive in home care.

DIDD also operates sixteen Residential Community Intermediate Care Facilities, which are community homes in East Tennessee that house four individuals each. DIDD employs direct care workers to provide the care, including nursing and therapy services, that these individuals might need within the community home. For these community homes, unlike under the Waiver Program, DIDD provides direct care and bills TennCare directly for the services its employees provide in the home.

A conservator, such as the Noreds, may work with an independent support agency and coordinator ("ISC") to find a willing provider to provide the needed services for the disabled ward. The ISC develops an Individual Support Plan ("ISP"), which identifies what services an individual needs and any risks and establishes goals for treatment. The ISC then would forward that plan to potential providers who might be able to meet the individual's needs. The provider must be certified by the state and willing to provide care to the specific individual. Ultimately, the individual and/or their conservators choose the provider. The ISC also submits the ISP to DIDD annually, noting any updates in providers or services for the individual. The ISP must be signed by the individual and/or their conservator and any of the third-party providers who will be rendering care to the qualified individual.

2

Nored's son is 50 years old and suffers from multiple and significant developmental disabilities. He has been disabled since he was a child. While he is able to read and take care of his own personal hygiene, he is unable to drive and cannot handle his own finances. He does not understand the severity of emergencies or how to properly interact within many social settings. He has also been diagnosed with intermittent explosive disorder, which affects his ability to control his behavior when he feels stressed or threatened. The Nored's son has been enrolled with DIDD since 2013. Because of his disabilities, he qualifies for the Medicaid Home and Community-Based Services Waiver Program, with no cap on the services that he can receive.

The Noreds purchased a home in Sevierville, Tennessee where they believed their son could receive in home services. Located near the heart of Sevierville, it was within a walking distance to shops, restaurants and attractions that they knew their son would enjoy. Prior to moving their son to Sevierville, he lived at Clover Bottom Developmental Center in Nashville. However, when that closed, it forced their move. In 2014, they moved their son into the Sevierville home. Engstrom Services, Inc. served as their ISC, both while he resided in Nashville and when he moved back to East Tennessee. The Noreds selected New Haven, LLC to provide care for their son in his Sevierville home and was included as his provider for community-based day and supported living services on his ISP in 2015, 2016, and 2017 [Exs. 2, 4, 5]. During the time that New Haven provided service, the Nored's son needed either Level Four or Level Six care, which required one or two staff members with him at all times to help manage his daily activities and accompany him on any trips into the community.

In 2016, the Noreds began to experience problems with the service that New Haven was providing. Upon reviewing footage from cameras inside the house, the Noreds observed New Haven employees being aggressive and inattentive to their son's needs. They attempted to resolve

3

these problems with New Haven's owner and director, Gary Hooks, but the issues continued. DIDD investigated the Noreds' allegations on two occasions and substantiated different incidents of emotional and physical abuse and supervision neglect by various New Haven employees [Exs. 13, 14]. New Haven terminated the employee who physically abused the Nored's son and counseled the other employees who were found to be neglectful. Despite the actions taken by DIDD and New Haven, the relationship between New Haven and the Noreds continued to deteriorate. Finally, New Haven submitted a letter of intent to discharge to DIDD in December 2016. However, because a provider is unable to withdraw from providing services without another provider in place to take over care, it continued to provide care for the Nored's son in his home until October 2017. At that point, the Noreds moved their son back to their home in Knoxville.

New Haven continued to work with Engstrom and the Noreds to resume services for their son in his Sevierville home. It offered to provide different staff. It also offered to drive him from his parents' house in Knoxville to his Sevierville home to provide services there. The Noreds demurred. The Noreds placed conditions on the type of staff who were allowed to provide services: no men and no African Americans. New Haven was unwilling and unable to comply with those conditions. New Haven did not have the available employees to staff the home as the Noreds requested. The Noreds refused to allow New Haven to provide any services in their Knoxville home, even threatening to call the police if New Haven employees came to the house.

New Haven remained as the Nored's son's provider on his ISP throughout 2017. On July 3, 2017, Engstrom Services and the Independent Support Coordinator held the annual ISP meeting. Typically, the individual's ISC, the Noreds, their son, and a representative from the support providers would attend this meeting. However, the Noreds specifically noted on the ISP form that they objected to the New Haven staff being present at ISP meeting [Ex. 4]. Even though New

4

Haven was included as the provider on the 2017 ISP, it did not sign the ISP [Ex. 4]. In November 2017, the Noreds filed a civil lawsuit against New Haven.

In July 2018, the Noreds and Engstrom submitted an ISP to DIDD requesting approval for the ISC and Adult Dental benefits [Ex. 5]. These services were approved by DIDD. There was no request for community-based day or supported living services because the Noreds had been unable to find a willing provider for these services. The Noreds noted that they participated in the ISP planning meeting but "disagree with the Level 4 services and Section C provider which should by law be New Haven." [Ex. 5]. Shortly after, the Noreds submitted an amendment to the 2018 ISP, which requested Level 6 community-based day and supported living services, with no provider listed [Exs. 6, 44]. These new requests were denied by DIDD because they did not identify a willing provider [Ex. 44]. The Noreds filed an appeal of this denial, and DIDD affirmed that it was unable to review these requests because they had not identified a willing provider. However, DIDD stated that it could pay for the services if a provider is found. The Noreds also requested these services without a specified provider in 2019 and 2020, which were similarly denied by DIDD.

From October 2017 until now, the Nored's son has resided with his parents in their home in Knoxville. During this time, Engstrom searched for a replacement provider by sending out monthly emails to 51 DIDD-certified providers but has been unable to find one willing to provide service at the Sevierville home. Again, the Noreds placed non-negotiable conditions on the type of staff who may work with their son: no men and no African Americans. They would also only consider providers who could service Bill's home in Sevierville. DIDD also made an effort to find a provider to provide services in Sevierville. In July 2019, DIDD created a one-page summary of the Nored's son's support needs and sent that summary to 42 providers in the area. Five did not respond, twenty-one declined, and sixteen providers responded positively, under the circumstance

that the son would move into a home that they were already providing support to or if he was willing to relocate [Ex. 56]. So far, despite these efforts by Engstrom and DIDD, they have been unable to find a provider willing to provide services to the Nored's son in his Sevierville home.

## II. Conclusions of Law

The Noreds, as conservators for their son (collectively, "Plaintiffs"), allege that Defendants are in violation of the Medicaid Act, 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 by refusing to provide care and services to Bill.

## A.     42 U.S.C. § 1983 as to DIDD

### i.     Duty to Provide "Medical Assistance"

The Medicaid Act, 42 U.S.C. § 1396, *et seq*., "authorizes the Federal Government to provide funds to participating States to administer medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services." *Harris v. Olszewski*, 442 F.3d 456, 460 (6th Cir. 2006). Participating states must "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." § 1396a(a)(8).[1] "Medical assistance" is now defined as "payment of part or all of the cost of the following care and services or the care and services themselves, or both…[to individuals] who will receive home and community-based services pursuant to a State plan amendment under such subsection." § 1396d(a)(xvii) (effective Mar. 23, 2010).

Plaintiffs argue that this definition requires DIDD to either pay someone to provide the necessary services to their son or to provide the services themselves. Since the Noreds have been

---

[1]     42 U.S.C. § 1396a(a)(10) generally provides that the state shall "provide for making medical assistance available" to various qualified individuals. The parties do not specify which subsection applies in this case, but no one disputes that their son qualifies under this section.

unable to find a third-party provider willing to provide services, they allege that DIDD must provide the services directly instead.

As background, in 2006, the Sixth Circuit decided a seminal case in the interpretation of "medical assistance" as defined by the Medicaid Act. *See Westside Mothers v. Olszewski*, 454 F.3d 532 (6th Cir. 2006). The plaintiffs argued that the Medicaid Act mandated "the actual provision of, or arrangement for, certain medical services, including care, medicine, and equipment." *Id.* at 539. At that time, "medical assistance" was defined in the Act as "'payment of part or all of the cost of the [enumerated] services' to eligible individuals 'who are under the age of 21.'" *Westside Mothers*, 454 F.3d at 540 (quoting 42 U.S.C. § 1396d(a) (version effective Feb. 8, 2006)). The Court found

> Plaintiffs nevertheless contend that the language of §§ 1396a(a)(8), 1396a(a)(10) expands the definition of "medical assistance" beyond simply payment for services to include actual provision of services. After examining the text and the structure of the statute, *we do not believe §§ 1396a(a)(8), 1396a(a)(10) require the State to provide medical services directly.* The most reasonable interpretation of § 1396a(a)(8) is that all eligible individuals should have the opportunity to apply for medical assistance, i.e., financial assistance, and that such medical assistance, i.e., financial assistance, shall be provided to the individual with reasonable promptness.

*Id.* (emphasis added)

After the definition of "medical assistance" was changed to include the option of providing direct care and services and not just payment for those services, the Sixth Circuit still confirmed that "the new definition does not affect this holding [in *Westside Mothers*] because a state may still fulfill its Medicaid obligations by paying for services" under §§ 1396a(a)(8) and (10). *John B. v. Goetz*, 626 F.3d 356, 360 n.2 (6th Cir. 2010).

Plaintiffs rely on two more recent cases in support of their argument. *See* § 1396d(a) (emphasis added). In *John B. v. Emkes*, 852 F. Supp. 2d 944 (M.D. Tenn. 2012), the plaintiffs

7

challenged TennCare, as implemented by the defendant as Commissioner of the Tennessee Department of Finance and Administration, for failing to provide early and periodic screening, diagnosis and treatment services to Tennessee children under § 1396a(a)(43). *Id*. at 945.[2] In direct response to the change in the definition of "medical assistance," the district court found "that where, as in § 1396a(a)(43)(B) and (C), the language of a provision clearly requires that the state 'provide or arrange for the provision' of screening services and corrective treatment, that language cannot reasonably be construed to mean only payment for services…." *Id*. at 951. However, it also noted

> to be clear, these provisions do not require the State to become a 'direct medical provider,' as the State asserts. Rather, these provisions require the State to ensure that Medicaid-eligible children receive 'screening services' and 'corrective' treatment under certain circumstance. To satisfy its obligations, the State may either provide services directly or hire others to do so.

*Id*. at 951-52.

However, courts have distinguished the state's financial requirements based on a claim under §§ 1396a(a)(8) and (10) and § 1396a(a)(43). Section 1396a(a)(43) requires the state to "'provide for' informing Medicaid-eligible children about available EPSDT benefits, providing or arranging for screening services where requested, and then arranging for treatment of problems disclosed by such screening." *Troupe v. Barbour*, No. 3:10-CV-153-HTW-MTP, 2013 WL 12303126, at *3 (S.D. Miss. Aug. 23, 2013), *report and recommendation adopted by Troupe v. Bryant*, No. 3:10-CV-153-HTW-LRA, 2016 WL 6585299 (S.D. Miss. Nov. 7, 2016); *see also Emkes*, 852 F. Supp. 2d at 951. However, § 1396a(a)(8) and (10) only requires the state to provide

---

[2]       *See* 42 U.S.C. § 1396a(a)(43)(B) and (C) ("A State plan for medical assistance must provide for providing or arranging for the provision of such screening services in all cases where they are requested and arranging for…corrective treatment the need for which is disclosed by such child health screening services…").

that all individuals who qualify and wish to make an application for medical assistance can do so and that such medical assistance is subsequently furnished with reasonable promptness. In fact, in *Emkes*, the district court specifically acknowledged that the holding in *Westside Mothers* "turned entirely on the particular language of the statutory provisions at issue in that decision," namely, §§ 1396a(a)(8) and (10). That is how the *Emkes* court distinguished itself from the holding in *Westside Mothers* and *Goetz*, as it dealt with § 1396a(a)(43). While courts have found that Section 43 itself requires action beyond the payment of services, the same is not true for Sections 8 and 10.

In *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, the Sixth Circuit addressed the plaintiffs' claim that the defendants "failed to ensure that the individual Plaintiffs were able to obtain medically necessary services with reasonable promptness, in violation of §§ 1396a(a)(8) and (10)(A)." 979 F.3d 426, 449 (6th Cir. 2020). Specifically, the plaintiffs claimed that because the state changed its budget methodology for paying for community living services, "the funding they receive no longer suffices to cover the services required by their" individuals plans of service. *Id*. at 438-39. In relevant part, the Court found that "the CLS services that Plaintiffs seek clearly fall within the 'medical assistance' that must be paid for or provided by the State with relative promptness pursuant to §§ 1396a(a)(8) and (10)(A)." *Id*. This holding only states that the community living services fall within the definition of "medical assistance."

Plaintiffs interpret these cases to mean that if DIDD does not pay for services then it *must* provide the services itself. DIDD disagrees, arguing that the updated definition of "medical assistance" still allows for the state to fulfill its Medicaid obligation by paying for services and does not mandate DIDD to provide the services itself. *See John B. v. Goetz*, 626 F.3d 356, 360 n.2 (6th Cir. 2010). As it is willing and able to pay for the Nored's son's needed services, Defendants argue they have then satisfied their duty under the Medicaid Act. There is no case at this time that

holds that if the state is not actively paying for medical services then instead it *must* provide the services themselves. Instead, courts have interpreted "medical assistance" directly contrary to Plaintiffs' argument. In *K.B. by Next Friend T.B. v. Michigan Dept. of Health and Human Servs.*, the court noted that the current definition of "medical assistance" "gives a state three different options: provide services directly, pay for services, or both provide and pay for services….Contrary to Plaintiffs' argument, a state may choose to only pay for services." 367 F. Supp. 3d 647, 657 (E.D. Mich. 2019). DIDD maintains that it has meet this requirement by being willing to pay for services, *if* the Noreds are able to identify a willing provider. Obviously, if the Noreds place unreasonable and unfortunate restrictions based on sex and race of the person who can provide their son the needed services, then the Noreds should not complain when DIDD cannot find any willing provider. And, it is no surprise that the Noreds cannot find one either.

In accordance with 42 C.F.R. § 431.51(b)(1), "[a] beneficiary may obtain Medicaid services from any institution, agency, pharmacy, person, or organization that is (i) qualified to furnish services; and (ii) willing to furnish them to that particular beneficiary." This gives the beneficiary the freedom to choose their desired provider, as long as it is qualified and willing to provide services. *See O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 785 (1980) (finding that the Medicaid Act "gives recipients the right to choose among a range of qualified providers, without government interference") (emphasis omitted). The Supreme Court in *O'Bannan* also clarified that the right to choose

> confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified. But it clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified.

10

*Id*. DIDD may not force the Noreds to choose a provider for their son. It cannot make the Noreds chose a particular provider they object to. But if the criteria the Noreds have imposed eliminate any available providers, then that is a decision that rests on the Noreds – not DIDD. Moreover, to the extent that the Noreds argue that because there are no providers, DIDD should provide the service directly, that still does not address the unreasonable restrictions imposed by the Noreds. DIDD might still not be able to meet the demands of the Noreds to have only white females take care of their son.

The Noreds originally chose New Haven to provide supported living and community-based day services at the Sevierville home, and New Haven provided these services for a time. DIDD approved and paid New Haven. However, after the Noreds filed allegations of abuse against New Haven employees in 2016, the relationship broke down. New Haven submitted a letter of discharge in December 2016 but continued to provide care, as required until another provider was in place to ensure continuity of service. During that time, the Noreds made various staffing and training requests that New Haven was unable to provide. Most significantly, Ms. Nored requested that New Haven only send female staff to care for her son. She also stated that her son had issues with African Americans and that he did not want them in the home. New Haven was unable to accommodate these requirements due to a lack of available staff. Gary Hooks, owner of New Haven, specifically noted that one staff member that was liked by the Noreds was working seven days a week, 12 to 16 hours a day, which resulted in excessive overtime.

When they moved their son into their house in Knoxville, New Haven attempted to continue providing care to them. In addition to providing some services to him at the home in Knoxville, New Haven offered to take the Nored's son to his Sevierville home during the day and provide services at his home. Because the funding for supported living and community-based day

11

services were billed through his Sevierville home, New Haven could only get paid for providing services at that location. However, when New Haven attempted to continue service, the staff complained about how they were treated when they attempted to provide care at the Noreds' Knoxville home, to the point that staff refused to return to the home. This included the Noreds turning staff away from the home and threatening to call the police.

At the 2017 ISP meeting, the Noreds requested that New Haven not participate in the meeting, which meant they were unable to sign the support plan. New Haven was still included as the Nored's son's care provider at that time. In 2018, the ISP did not include a request for community-based day or supported living services, which meant that New Haven was also naturally not included on the ISP. This meant that New Haven could not get paid even if it did provide services. While the Noreds signed and approved the 2018 ISP, Ms. Nored noted that "by law" New Haven should still be included as her son's provider. However, the plan was submitted this way because the Noreds could not find another willing provider for supported living or community-based day services, despite the efforts of Engstrom and the designated independent support coordinator ("ISC"). Stephanie Hernandez, the Nored's son's ISC at the time, testified that this is due to the restrictions placed upon the providers by the Noreds: specifically, the location of the home in Sevierville, the cameras installed inside the home, and the restriction of only white, female staff.

In July 2019, DIDD also attempted to find a provider. It sent out a profile to 42 providers. Twenty-one providers responded that they could not provide services to Bill, five did not respond at all, and sixteen responded that they would be willing to provide services under certain circumstances. Some providers had vacancies in other homes that they were already providing support in and others would be willing to provide support if he was willing to relocate out of

Sevierville. However, there were no providers willing to provide services in the Sevierville home, which was a requirement of the Noreds.

Throughout this process, DIDD has maintained that it was willing and able to pay for the requested services if the Noreds were able to specify a provider. *See* [Exs. 46, 48]. This includes the level 6 support living and community participation services that the Noreds have maintained their son requires. In the June 21, 2019, letter denying the Noreds' service request, DIDD additionally noted that the level 6 services are "covered under the CAC waiver program. We think this care is medically necessary." [Ex. 46, pg. 1].

This is not the same case as in *Waskul* where the plaintiffs claim that the state can no longer pay for services due to a budgetary change. DIDD has demonstrated that it will pay for the required services. It has paid in the past and maintains that it is willing and able to pay for whatever qualified provider that the Noreds choose. The problem is not that DIDD refuses to pay. The problem is that the Noreds are unable to find a provider due to the various restrictions that they have placed on who can provide care and where that care is provided. This is not the fault of DIDD. In fact, both DIDD and the ISC have made extensive efforts to find a provider for Bill, to no avail, due to the various restrictions the Noreds have established. Because of that, it is no wonder that DIDD and the Noreds have found no willing providers. Nor can they. But that is not the fault of DIDD. Accordingly, the Court finds DIDD has satisfied its duty to provide medical assistance to the Nored's son under 42 U.S.C. § 1396a.

### ii. Fundamental Alteration

DIDD argues that requiring it to render medical services directly to Nored's son would "fundamentally alter the administration of the HCBS Waiver Program." [Doc. 141, pg. 35].

Under the Americans with Disabilities Act ("ADA"),

discrimination includes a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii); *see also* 28 C.F.R. § 35.130(b)(7)(i). This exception is also implemented under the Rehabilitation Act. *See* 28 C.F.R. § 41.53 ("A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.").

The Supreme Court interpreted this exception to find that "[s]ensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 604 (1999). In other words, "an accommodation is reasonable unless it requires 'a fundamental alteration in the nature of a program' or imposes 'undue financial and administrative burdens.'" *Smith & Lee Assoc. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996) (quoting *Southeastern Cmty. College v. Davis*, 442 U.S. 397, 410, 412 (1979)). In each case, the Court must "conduct an individualized inquiry and make appropriate findings of fact." *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 (1987).

Here, Plaintiffs argue that as DIDD already provides services within the Intermediate Care Facilities, then it would not be a fundamental alteration to also provide care to individuals in their own homes under the HCBS Waiver Program [Doc. 138, pg. 35]. In opposition, DIDD argues that the two programs, the Intermediate Care Facilities and the HCBS Waiver Program, are two entirely

14

different programs which are operated in different manners and funded in different ways under the Medicaid Act. Therefore, it is not analogous to assume that because DIDD provides direct care in the state-run care facilities that it would be able to provide care to individuals in their own homes without "fundamental alteration" of the waiver program itself.

For the Intermediate Care Facilities, DIDD operates 16 community homes, with four people in each home, where 24-hour care is provided by state employees, nurses, and direct care support staff. DIDD bills TennCare directly for services rendered within these homes. DIDD does not approve or render payment for the Intermediate Care Facilities. In contrast, for the HCBS Waiver Program, DIDD preauthorizes services presented through an individual's support plan and then processes the billing from the care provider for services rendered. DIDD approves the billing of services, and TennCare ultimately pays the provider. For the Intermediate Care Facilities, "DIDD does not authorize or approve payment of services because it would essentially authorize and approve payment to itself." [Doc. 141, pg. 37]. Therefore, if DIDD provided services itself through the waiver program, it would have to adjust how the funding is authorized and billed, so that it would not be authorizing payment to itself. While Plaintiffs allege that "[m]ost clients in [their son's] predicament would likely agree to waive this 'conflict'" of DIDD authorizing payments to itself, the conflict is not with the client but between DIDD and TennCare. [Doc. 138, pg. 46].

Plaintiffs also assume that "DIDD would not have to provide direct services to the 2400 people it serves in the East Tennessee region." [Doc. 138, pg. 46]; [Doc. 142, pg. 29] ("Defendants would only be required to provide direct services in the rare instances where a willing provider could not be located."). However, this does not defeat the fact that DIDD would have to hire and train individuals to fill these roles and find a new way to bill for these services, even for just one

15

individual. DIDD is not a licensed service provider who would be approved to provide services within an individual's home. Notwithstanding, as DIDD avers, "[e]ven then, DIDD cannot be expected to treat Bill Nored differently than other enrollees if they, in turn, then demand that direct care be given in their preferred home or within their preferred conditions." [Doc. 141, pg. 37, n. 20]. Therefore, to provide direct care in his home would be a fundamental alteration of the HCBS Waiver Program.

**B.     42 U.S.C. § 1983 against Commissioner Turner**

Under 42 U.S.C. § 1983, "[e]very person, who under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…." As is applicable in this case, the Sixth Circuit has found that §§ 1396a(a)(8) and (10) create a private right of action. *Waskul*, 979 F.3d at 448.

Plaintiffs claim that Commissioner Turner has violated § 1983 and the Medicaid Act by failing to provide medical assistance to their son as required.[3] Plaintiffs allege that "if Defendants cannot pay someone to provide [their son] with the services and care he requires in his Sevierville home because there are allegedly no other caregivers in the area capable of providing those types of services to [their son] on Defendants' terms, then DIDD *must* provide the care and services directly to him." [Doc. 138, pg. 34] (emphasis in original). However, as explained above, DIDD did not have a duty to provide direct support in this situation. Therefore, Commissioner Turner has not violated § 1983 and the Medicaid Act.

---

[3]     The parties "agree that Commissioner Turner is a person for purposes of § 1983 and that the Eleventh Amendment does not bar suits against state officials in their official capacity for prospective injunctive or declaratory relief." [Doc. 138, pg. 14, n. 13].

16

## C.  Americans with Disabilities Act and the Rehabilitation Act of 1973

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by a public entity." 42 U.S.C. § 12132. "To establish a claim of discrimination under Title II, a plaintiff must prove that: (1) [he] has a disability; (2) [he] is otherwise qualified; and (3) [he] is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of [his] disability." *Everson v. Leis*, 412 F. App'x 771, 774 (6th Cir. 2011) (citations omitted).

The Rehabilitation Act of 1973 provides that "[n]o otherwise qualified handicapped individual in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C.§ 794(a). The elements to prove a claim under the Rehabilitation Act "are largely similar to those of an ADA claim, with the additional requirement that the defendant be shown to receive federal financial assistance." *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 463 (6th Cir. 1997). Therefore, the Court shall analyze Plaintiffs' claims under the two statutes together.  Plaintiffs give three ways that Defendants have violated the ADA and the Rehabilitation Act.

### i.  Whether because of his disabilities, the Nored's son is being denied the benefits of DIDD's programs and services.

First, Plaintiffs argue that "if not for [their son's] multiple and significant developmental challenges…Defendants could have found a willing provider to provide [him] with care and services in his Sevier County home or even in his parents' home in Knox County." [Doc 138, pgs. 41-42]. As previously stated, the Noreds have the sole right to choose a provider for their son, so

17

it is impossible for Defendants to fail at finding a willing provider. *See* 42 U.S.C. § 1396a(a)(23); 42 C.F.R. § 431.51(b)(1). Even so, the Court has also described above DIDD's efforts to help the Noreds find a provider, including the profile sent out to DIDD's qualified providers in July 2019. The majority of providers indicated that they could not provide services in Sevier County, which is the location requested by the Noreds at the time. Other providers noted a general lack of staffing that would prevent them from providing the required care in any location. One provider specifically noted that they previously met with the Noreds and were uncomfortable with the Noreds' requirement of no black male staff in the home. [Ex. 56, pg. 2]. This further indicates that the inability to find a provider is not due to Defendants, but instead due to the unreasonable restrictions placed on the providers by the Noreds.

> **ii.** **Whether the Nored's son is at serious risk of institutionalization and is unjustly isolated in his home.**

Plaintiffs allege "because no provider has been identified and Defendants refuse to provide care to [their son] directly in his Sevierville home, [he] is at serious risk for institutionalization…." [Doc. 138, pg. 42]. "In addition, [he] is unjustly isolated at home because no provider can be found to provide him with the care and services that he is entitled to by law and Defendants refuse to provide him with any care directly." [Doc. 138, pg. 44]. These claims and the evidence cited by Plaintiffs for each are similar, so the Court shall address them together.

Both the ADA and the Rehabilitation Act require that services are administered "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (for the ADA); 28 C.F.R. § 41.51(d) (for the Rehabilitation Act). This means a setting "that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Olmstead*, 527 U.S. at 592 (quoting 28 C.F.R. pt. 35, App. A, p. 450 (1998)). "[C]ourts have widely accepted that plaintiffs can state a claim for violation of the

integration mandate by showing that they have been placed at serious risk of institutionalization or segregation." *Waskul*, 979 F.3d at 460 (aggregating cases). "Plaintiffs may show a sufficient risk of institutionalization if a public entity's failure to provide community services or its cut to such services will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Id*. at 461 (quoting U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (last updated Feb. 25, 2020), https://www.ada.gov/olmstead/q&a_olstead.htm) (internal quotation marks omitted). "[T]he isolation of individuals with disabilities in a home environment can also violate the integration mandate." *Id*. at 462.

However, "[a]s the *Olmstead* Court clarified, the integration mandate does not impose a 'standard of care' or require 'a certain level of benefits to individuals with disabilities.'" *Id*. at 463 (quoting *Olmstead*, 527 U.S. at 603 n.14). "Instead, the question is whether Plaintiffs are provided services in the setting that enables them to interact with non-disabled persons to the fullest extent possible." *Id*. (quoting *Olmstead*, 527 U.S. at 592) (internal quotation marks omitted).

Plaintiffs allege that because DIDD does not provide direct care to the Nored's son, he had to move into his parent's home for them to take care of him. Plaintiffs state that when the Noreds are no longer around, "[he] will likely be forced to submit to institutionalization, given that there is no plan in place for his care." [Doc. 138, pg. 43]. The Noreds are elderly and in poor health. This is undisputed. Because of the location of the Noreds' Knoxville home, their son is less independent than he was in his Sevierville home, where he was able to participate in the local community. This, Plaintiffs argue, isolates their son within the Knoxville home. Throughout the time that he has been at his parent's Knoxville home, the Noreds have brought in various

individuals to take him into the community, such as Marlissah Hayes, Heather Canonico, and Teresa Hill, as they are unable to do so regularly themselves.

Defendants respond that "Plaintiffs presented no evidence that Defendant[s] engaged in any action that placed Bill Nored at a serious risk of institutionalization" or that they "caused Bill Nored to be isolated within his home." [Doc. 141, pgs. 25, 27]. Specifically, they argue that they were not the impetus that caused him to lose his care provider and be removed from his home. DIDD had been paying for New Haven's services in their son's Sevierville home until the Noreds took him to their home in Knoxville in 2017. In 2018, the supported living and community-day services were removed from the ISP. Therefore, there was no one for DIDD to pay. This chain of events was not started by any action of DIDD but instead stemmed from the fallout between New Haven and the Noreds and the removal of the Nored's son from his Sevierville home.

As previously discussed, the burden is now on the Noreds to choose a new provider for their son, which has been hindered by the conditions placed on a potential provider. DIDD continues to pay for some services, including respite and independent support coordinator services. Both DIDD and the ISC have continued to search for a willing provider for Bill. However, the ultimate decision is left to the Noreds, and since they are unwilling to relocate their son out of Sevier County and have imposed certain racial and gender specific restrictions for staff, they have been unable to find a willing provider.

Defendants also argue that even if the Noreds were unable to continue caring for him, their son's brother, Andrew Nored, is the backup conservator. If this were to happen, they argue, he may be able to find a willing provider for Bill. *See* [Doc. 141, pg. 27] ("There was no evidence that Andrew would continue to impose Plaintiffs' conditions on staff and location should he become Bill Nored's primary conservator.").

20

While the right to choose falls to Plaintiffs, that right does not necessarily "confer a right to continued residence in the home of one's choice." *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 785 (1980). There are limits to the Plaintiffs' right to choose. For example, in *O'Bannon*, the state decertified a nursing home, requiring the residents on state assistance to move to another, certified facility. *Id*. at 776. The Court found that even though the residents had the right to choose the facility, they did not have the right to a hearing with the state before it decertified that facility. *Id*. at 775. Similarly, the Second Circuit has addressed a similar issue, finding that the plaintiffs did not have a right to choose a provider who had been decertified by the state. *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 178 (2d Cir. 1991). "The *O'Bannon* Court distinguished between direct Medicaid benefits—financial assistance—and indirect ones—e.g., freedom of choice. The Court held that state action that incidentally burdens an indirect governmental benefit does not rise to the level of a deprivation of a liberty interest." *Id*.

Similarly here, while New Haven was not decertified by the state, it did become unwilling to provide services under very difficult circumstances. While it continued to provide, or attempted to provide, services until the 2018 ISP meeting, as required, its obligation ended due to the actions of the Noreds when they refused its presence at the meeting. DIDD remains able and willing to pay for services. Therefore, DIDD did not put the Nored's son at risk of institutionalization. As to the allegation of isolation within the Noreds' Knoxville home, there is evidence that he is still able to go out into the community and interact with non-disabled individuals. Thus, DIDD has not caused the Nored's son to be isolated within his Knoxville home.

The evidence in this case is directly contrary to Plaintiffs' assertions that Defendants have discriminated against their son because of his disabilities. Therefore, Plaintiffs claims under the ADA and the Rehabilitation Act must fail.[4]

## III.    Conclusion

Given the above findings of fact and conclusions of law, the Court finds that Plaintiffs are not entitled to declaratory or injunctive relief. The case shall be **DISMISSED WITH PREJUDICE**. A separate judgment shall enter.

SO ORDERED:


s/ Clifton L. Corker
United States District Judge

---

[4]    Defendants also argues that they are immune from suit under the ADA pursuant the Eleventh Amendment. Under the ADA, "[a] State shall not be immune under the eleventh amdnemtn to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. 42 U.S.C. § 12202. However, the Supreme Court has held that "Title II of the ADA validly abrogates state sovereign immunity for conduct that actually violated the Fourteenth Amendment." *Williams v. McLemore*, 247 F. App'x 1, 8 n. 4 (6th Cir. 2007) (citing *United States v. Georgia*, 546 U.S. 151, 159 (2006)). The courts must determine, "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159. As the Court has found that Defendants did not violate the ADA, the Court shall not address sovereign immunity any further.

22